UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

VITTORIO ABBRUZZINO,

Case No. 08-11534

      Plaintiff,

Robert H. Cleland

v.

United States District Judge

DR. HUTCHINSON, *et al*.,

Michael Hluchaniuk
United States Magistrate Judge

      Defendants.

_____/

**REPORT AND RECOMMENDATION**
**ON DEFENDANTS' MOTION TO DISMISS (Dkt. 55)**

## I.   PROCEDURAL HISTORY

Plaintiff, Vittorio Abbruzzino, is a prisoner in the custody of the State of Michigan.  (Dkt. 1).  Pursuant to 42 U.S.C. § 1983, plaintiff filed a complaint against defendants on April 9, 2008, alleging that they violated his constitutional rights.  *Id.*  District Judge Robert H. Cleland referred this matter to the undersigned for all pre-trial matters on April 23, 2008.  (Dkt. 6).  Defendants filed a motion for summary judgment on July 22, 2009.  (Dkt. 55).  Plaintiff filed a response on September 11, 2009.  (Dkt. 61).  Defendants filed a reply on September 22, 2009. (Dkt. 62).  This matter is now ready for report and recommendation.  For the

reasons set forth below, it is **RECOMMENDED** that defendants' motion for summary judgment be **GRANTED**.

## II.    STATEMENT OF FACTS

The facts, as detailed by defendants in their motion for summary judgment, are largely uncontested by plaintiff.  In his complaint, plaintiff raises allegations concerning the medical care and treatment that he received while incarcerated at the following MDOC facilities: 1) Pugsley Correctional Facility, located in Kingsley, Michigan; 2) Camp Cusino, located in Shingleton, Michigan; and 3) Cooper Street Correctional Facility, located in Jackson, Michigan.  (Dkt. 1). Plaintiff testified that in July 2004 (before he was incarcerated), he was struck by an automobile resulting in a fracture of his tibia and fibula.  (Dkt. 55, Ex. E, pp. 7-8).  Plaintiff subsequently underwent corrective surgeries at Garden City Hospital and St. Joseph Mercy Hospital.  (Dkt. 55, Ex. D, p. 205).  Plaintiff then had a muscle graft and two skin graft surgeries, all of which failed.  (Dkt. 55, Ex. D, p. 205).  Plaintiff's open wound was treated with conservative management for a period of time until he became incarcerated in 2005.  (Dkt. 55, Ex. D, p. 205).

Defendant Paula Meyer, NP was a nurse practitioner at the Pugsley Correctional Facility.  She is educated and trained as a nurse practitioner and has been licensed by the State of Michigan to practice as such since June 13, 2001. (Dkt. 55, Ex. C).  During the relevant period in question, Dr. Hutchinson was an

infectious disease specialist who treated MDOC inmates referred to him at the Duane Waters Hospital, located in Jackson, Michigan.  Dr. Hutchinson is a fully educated and trained medical doctor, he has been licensed as such to practice medicine in the State of Michigan since July 27, 1981, and is board certified in the medical specialty of infectious disease.  (Dkt. 55, Ex. C).

On August 30, 2005, after a brief stay at the MDOC's Reception and Guidance Center, plaintiff was transferred into the Pugsley Correctional Facility. (Dkt. 55, Ex. D, p. 755).  On entering the Pugsley Correctional Facility, plaintiff was seen for an intake screening by Denice R. Borowski, RN.  (Dkt. 55, Ex. D, p. 755).  RN Borowski noted that plaintiff had an open wound on his left leg from a motor vehicle accident, that he had previously had multiple surgeries and skin grafts, and that he required daily dressing changes.  (Dkt. 55, Ex. D, p. 755).  RN Borowski then scheduled plaintiff to be seen by the medical service provider, defendant Paula Meyer, NP, on September 1, 2005.  (Dkt. 55, Ex. D, p. 758).

On September 1, 2005, as scheduled, Meyer saw plaintiff for the first time. (Dkt. 55, Ex. D, p. 751).  Meyer noted that plaintiff had a history of an open fracture of the left tibia and fibula with 10 surgeries and 2 failed skin grafts, resulting in an open wound that is healing by secondary intention with daily dressing changes.  (Dkt. 55, Ex. D, p. 751).  She also noted that plaintiff was taking Keflex, an antibiotic medication.  (Dkt. 55, Ex. D, p. 751).  Meyer measured

plaintiff's wound as 14.5cm in length by 6cm in width with good granulation. (Dkt. 55, Ex. D, p. 751). Meyer ordered a wound culture and daily dressing changes and requested a follow-up appointment with plaintiff in one month. (Dkt. 55, Ex. D, pp. 751, 752).

On September 6, 2005, the wound culture of plaintiff's left leg wound was taken. (Dkt. 55, Ex. D, p. 744). On September 12, 2005, plaintiff was again seen by Meyer for a follow-up of the wound culture, which revealed that plaintiff had a MRSA infection. (Dkt. 55, Ex. D, p. 733). Meyer prescribed plaintiff Bactrim DS and Rifampin, antibiotic medications, to be taken twice a day for 14 days. (Dkt. 55, Ex. D, p. 733). On October 3, 2005, Meyer saw plaintiff for a follow-up appointment. (Ex. D, p. 708). Meyer examined plaintiff's wound and noted that it was slightly smaller, measuring 12 cm by 6 cm with good granulation tissue. (Dkt. 55, Ex. D, p. 708). Meyer determined that she would continue daily dressing changes and that plaintiff should follow-up in 2 months. (Dkt. 55, Ex. D, p. 708). Meyer also requested a tennis shoe detail for plaintiff, which was approved, because she was concerned about the integrity of the surrounding tissue. (Dkt. 55, Ex. D, pp. 708, 706).

On October 19, 2005, Meyer again saw plaintiff after he complained about increased pain in his left ankle and wound and expressed concerns that the pins in his leg were coming out. (Dkt. 55, Ex. D, p. 683). Meyer examined plaintiff's

ankle and noted that there was no swelling or erythema, no dimpling, that he had

brisk capillary refill in his medial ankle, and that his foot was warm and pink.

(Dkt. 55, Ex. D, p. 683).  She ordered x-rays of plaintiff's left ankle to rule out

osteomyelitis, and prescribed Elavil, a pain medication.  (Dkt. 55, Ex. D, p.

683-685).  X-rays of plaintiff's left leg were taken on October 24, 2005, which

revealed an old fracture with no evidence of active osteomyelitis.  (Dkt. 55, Ex. D,

p. 819).

On October 30, 2005, during one of plaintiff's routine daily dressing

changes, Carol Clous, RN observed what she believed to be changes to the

appearance of plaintiff's wound and requested that Meyer see plaintiff on

November 1, 2005.  (Dkt. 55, Ex. D, p. 670).  On November 1, 2005, plaintiff was

seen by Meyer as requested.  (Dkt. 55, Ex. D, p. 666).  Meyer examined plaintiff's

wound, and noted that it appeared worse than when she last saw him.  (Dkt. 55, Ex.

D, p. 666).  Meyer provided plaintiff with a 10-day supply of Keflex and submitted

a request for a surgical consultation to evaluate the need for a possible surgical

debridement of plaintiff's wound or another skin graft surgery.  (Dkt. 66, Ex. D,

pp. 664-666).  In that request, Meyer noted that plaintiff sustained a fracture of his

left tibia and fibula on July 25, 2004, that he had two subsequent skin grafts, that

his wound was healing by secondary intention, and that although the wound

initially began to improve, its improvement had now ceased.  (Dkt. 55, Ex. D, pp.

664-665).  On November 2, 2005, the utilization review physician reviewing
Meyer's request determined to not authorize the request because skin grafts almost
never take after two failures and the medical service provided should be able to
give adequate debridement when needed.  (Dkt. 55, Ex. D, pp. 664-665).

On November 9, 2005, Roberto A. Viguilla, MD, another medical service
provider at the Pugsley facility, examined plaintiff, noted that the surgical
consultation was not authorized, and noted that nursing reported that the wound
appeared to be improving, an observation with which plaintiff agreed.  (Dkt. 55,
Ex. D, p. 656).  Dr. Viguilla then examined Plaintiff's wound, which measured
13cm by 3.5cm, had fairly healthy borders, no drainage, and no signs of infection.
(Dkt. 55, Ex. D, p. 656).  Dr. Viguilla then determined to continue the daily
dressing changes and plaintiff's use of Keflex, and plaintiff was in agreement with
this course of action.  (Dkt. 55, Ex. D, p. 656).  On November 19, 2005, plaintiff
was again seen by Meyer for a follow-up appointment.  (Dkt. 55, Ex. D, p. 645).
Meyer examined plaintiff's wound, noted that it was granulating nicely and that it
appeared to be much shallower than during her last examination.  (Dkt. 55, Ex. D,
p. 645).  Meyer assessed plaintiff with a gradually healing wound, instructed him
to notify health care if the wound edges deteriorated, and increased his prescription
for the pain medication Elavil, per plaintiff's request.  (Dkt. 55, Ex. D, pp. 645,

646).  She also requested a follow-up visit to occur in one month.  (Dkt. 55, Ex. D, p. 646).

On December 2, 2005, Meyer again saw plaintiff.  (Dkt. 55, Ex. D, p. 629). NP Meyer examined plaintiff's wound, which now measured 12 cm by 4.5 cm and which was much shallower than her last examination.  (Dkt. 55, Ex. D, p. 629). Meyer provided plaintiff with Hydrocortisone 1% cream to be applied cautiously and sparingly, to treat plaintiff's complaints of itching.  (Dkt. 55, Ex. D, p. 629, 630).  Meyer requested to see plaintiff again in approximately two months.  (Dkt. 55, Ex. D, p. 630).

On December 7, 2005, plaintiff was seen by Dr. Viguilla and reported that his wound "has improved a lot over the last several weeks."  (Dkt. 55, Ex. D, p. 623).  Dr. Viguilla assessed plaintiff with a stable post-skin graft wound, instructed plaintiff to continue with daily dressing changes, and renewed plaintiff's prescription of Keflex until February, 2006.  (Dkt. 55, Ex. D, p. 623).

On January 18, 2006, Meyer again saw plaintiff and he reported that his wound felt much better.  (Dkt. 55, Ex. D, p. 582).  She examined his wound, which now measured 11 cm by 3 cm and which appeared dramatically shallower than previously.  (Dkt. 55, Ex. D, p. 582).  Meyer decided to continue plaintiff's current wound care regime and requested a follow-up appointment to occur within six to eight weeks.  (Dkt. 55, Ex. D, pp. 582, 583).

Report and Recommendation
Defendants' Motion for Summary Judgment
*Abbruzzino v. Hutchinson, et al*; No. 08-11534

On March 28, 2006, Meyer saw plaintiff for a follow-up appointment.  (Dkt. 55, Ex. D, pp. 495, 497).  During this examination, plaintiff expressed no concerns regarding his leg, but only complained of a pimple on his right upper arm.  (Dkt. 55, Ex. D, p. 495).  Meyer then incised the boil on plaintiff's arm, removed the yellow exudate, and dressed the infected area.  (Dkt. 55, Ex. D, p. 495). She then wrote a 14-day order for Bactrim to treat plaintiff's arm, ordered daily dressing changes to be done in tandem with his leg dressing changes, and requested a follow-up appointment to occur in about two weeks.  (Dkt. 55, Ex. D, pp. 495, 496).  A follow-up appointment with Meyer occurred on April 5, 2006, and revealed that the infection on plaintiff's right arm had healed.

Meyer next saw plaintiff on May 9, 2006 for a follow-up regarding his leg wound.  (Dkt. 55, Ex. D, p. 442).  Plaintiff stated that he was pleased with the progress of his decreasing wound size.  (Dkt. 55, Ex. D, p. 442).  Meyer examined plaintiff and noted that his wound now measured 8 cm by 2.5 cm with pink granulation tissue present in the entire wound.  (Dkt. 55, Ex. D, p. 442).  Meyer decided to continue plaintiff's current dressing change regime, instructed plaintiff to notify health care if he noted dramatic improvement in his wound indicating no further need for daily dressing changes, and requested a follow-up appointment to occur in seven to eight weeks.  (Dkt. 55, Ex. D, p. 442).

On June 9, 2006, Meyer saw plaintiff for a follow-up of his leg wound, which plaintiff stated was shrinking daily.  (Dkt. 55, Ex. D, p. 395).  Meyer examined plaintiff's wound, which she noted was much smaller than during her last examination, and which had crisp skin edges and pink granulation tissue.  (Dkt. 55, Ex. D, p. 395).  Meyer assured plaintiff that his wound was healing steadily and that with a little more granulation, the daily dressing changes could cease.  (Dkt. 55, Ex. D, p. 395).

Meyer next saw plaintiff on June 30, 2006.  (Ex. D, p. 361).  During this visit, plaintiff requested a change of his dressing routine, requested to stop taking Elavil, and expressed that he was eager to be transferred to a camp.  (Dkt. 55, Ex. D, p. 361).  Meyer examined plaintiff's wound and noted that pink granulation tissue was evident throughout the wound with crisp clean edges.  (Dkt. 55, Ex. D, p. 361).  Meyer determined that plaintiff should continue with his dressing routine daily, however, she also expressed that she was confident that plaintiff could manage the dressings on his own if he was transferred to a camp, and changed his medical code to reflect no reservation so that plaintiff could be considered for a camp.  (Dkt. 55, Ex. D, p. 361).

On July, 22, 2006, during plaintiff's daily dressing change, he complained to RN Clous that he had right hip pain and swelling, which was similar to a site that he previously had on his right arm.  (Dkt. 55, Ex. D, p. 328).  RN Clous contacted

Report and Recommendation
Defendants' Motion for Summary Judgment
*Abbruzzino v. Hutchinson, et al*; No. 08-11534

Duane Waters Hospital and was instructed to give plaintiff Erythromycin, an antibiotic medication, to have plaintiff apply warm compresses to the area, to instruct plaintiff that he could take over the counter pain medications, and that he should contact health care if the wound begins to drain. (Dkt. 55, Ex. D, p. 329). On July 23, 2006, plaintiff again reported to RN Clous with increased complaints of pain, which spread to his right groin.  (Dkt. 55, Ex. D, p. 322).  RN Clous then sent plaintiff to the emergency room for evaluation of the bump.  (Dkt. 55, Ex. D, p. 322).  Plaintiff returned from the emergency room in the early morning hours of July 24, 2006, where the bump was lanced and Plaintiff was diagnosed with a possible MRSA infection.  (Dkt. 55, Ex. D, p. 318).  Plaintiff saw Meyer for a follow-up of his emergency room visit.  (Ex. D, p. 314). Meyer advised Plaintiff to change his bandaid in healthcare at the same time as his daily dressing change of his leg wound, to continue taking his medications, and to apply heat to the hip wound daily.  (Dkt. 55, Ex. D, p. 314).  Meyer also noted that she was awaiting the results of the wound culture of plaintiff's right hip wound.  (Dkt. 55, Ex. D, p. 314).  On July 26, 2006, Meyer saw plaintiff to discuss the results of the wound culture, which revealed that he had a MRSA infection on his right hip.  (Dkt. 55, Ex. D, p. 309).  Meyer prescribed Bactrim and Rifampin, two antibiotic medications, discussed the case with Dr. Viguilla, and attempted to contact Dr. Hutchinson, an infectious disease physician, to determine if other treatment would

Report and Recommendation
Defendants' Motion for Summary Judgment
*Abbruzzino v. Hutchinson, et al*; No. 08-11534

be advised.  (Dkt. 55, Ex. D, p. 309).  On July 28, 2006, Meyer noted that, per Dr. Hutchinson's recommendations, she should continue plaintiff's antibiotics.  (Dkt. 55, Ex. D, p. 305).

On August 15, 2006, plaintiff was transferred from the Pugsley Correctional Facility to Camp Cusino, as requested by plaintiff.  (Dkt. 55, Ex. D, p. 275).  While at Camp Cusino, plaintiff was regularly provided with supplies so that he could perform his daily dressing changes.  (Dkt. 55, Ex. E, p. 27).  Neither Meyer nor Dr. Hutchinson had any contact with plaintiff during the period in which he was incarcerated at Camp Cusino.  On December 6, 2006, plaintiff was transferred to the Cooper Street Correctional Facility.  (Dkt. 55, Ex. D, pp. 259-261).  While incarcerated at the Cooper Street Correctional Facility, plaintiff's daily wound dressing changes by health care staff resumed.  (Dkt. 55, Ex. E, p. 35).

On January 19, 2007, plaintiff was seen by the medical service provider at the Cooper Street facility, Judith Daoust, PA, and reported that his wound was healing well.  (Dkt. 55, Ex. D, p. 248).  Daoust noted that plaintiff's wound last measured 4.5 cm by 2 7/8 cm, and that plaintiff denied significant signs or symptoms.   (Dkt. 55, Ex. D, p. 248).  She continued plaintiff's daily dressing changes and instructed him to notify health care for any of his needs.  (Dkt. 55, Ex. D, p. 248).

Plaintiff went without any complaints until May 4, 2007, when he was again seen by Daoust.  (Dkt. 55, Ex. D, pp. 235-236).  During this examination, plaintiff reported that a "couple of days ago," he developed a boil-like lesion on his shin after scratching his leg.  (Dkt. 55, Ex. D, p. 235).  Daoust examined plaintiff's left leg, noted that he had a boil-like lesion on that leg, and also noted that he had a chronic leg ulcer on that same leg with good granulation.  (Dkt. 55, Ex. D, pp. 235-236).  Daoust submitted a consultation request form for plaintiff to be seen by an infectious disease specialist.  (Dkt. 55, Ex. D, p. 215).  Daoust's request was authorized on May 7, 2007, and an appointment was scheduled with Dr. Moudgal at Duane Waters Hospital to occur on May 17, 2007.  (Dkt. 55, Ex. D, p. 215).  On May 17, 2007, plaintiff was seen by Dr. Moudgal, the infectious disease specialist at the Duane Waters Hospital.  (Dkt. 55, Ex. D, p. 205-207).  Plaintiff recounted the history of his injury, as well as the fact that his original open wound resulting from the injury was treated regularly since his incarceration and decreased in size to about 2cm by 1cm.  (Dkt. 55, Ex. D, p. 205). Plaintiff also recounted that, about two weeks earlier, he was scratching the top of his left shin and noticed a large, pus-filled bump at the site, which opened up with purulent discharge.  (Dkt. 55, Ex. D, p. 205).  Plaintiff noted that the bump subsided and that he had no problems with the open ulcer or his previous wound.  (Dkt. 55, Ex. D, p. 205).  Dr. Moudgal examined Plaintiff, noting that his original wound, measuring 2 cm by 1 cm, was

healing well and that his shin appeared to only have a tiny scab.  (Dkt. 55, Ex. D, p. 206).  Dr. Moudgal determined that, given Plaintiff's history, he may have osteomyelitis, and requested a triple phase bone scan, as well as a follow-up appointment with infectious disease once the scan was completed.  (Dkt. 55, Ex. D, p. 207).

On May 21, 2007, Daoust, per Dr. Moudgal's recommendations, submitted a request for plaintiff to receive a triple phase bone scan and a follow-up appointment with infectious disease.  (Dkt. 55, Ex. D, p. 195).  The request was pended with a request to submit plaintiff's Garden  City records from 2004.  (Dkt. 55, Ex. D, p. 195).  On June 4, 2007, plaintiff was called out to sign a release form for Garden City Hospital, but plaintiff stated that he was no longer having issues with his leg and that he did not want any further treatment.  (Dkt. 55, Ex. D, p. 186).  On June 4, 2007, the request was not authorized because plaintiff was paroling out in 40 days and did not want any of the requested procedures.  (Dkt. 55, Ex. D, p. 184).

On September 5, 2007, after plaintiff was unsuccessful in paroling out, he was seen by Daoust.  (Dkt. 55, Ex. D, pp. 140-142).  Daoust, noted that Plaintiff had previously signed off on a requested triple phase bone scan and appointment with infectious disease due to the fact that he believed that he was paroling out.  (Dkt. 55, Ex. D, p. 140).  She then resubmitted her request for a triple phase bone

scan and follow-up appointment with infectious disease.  (Dkt. 55, Ex. D, p. 134).

The request was authorized and a bone scan was scheduled for September 25,

2007.  (Dkt. 55, Ex. D, pp. 134-135).  On September 25, 2007, a triple phase bone

scan was performed.  (Dkt. 55, Ex. D, pp. 122-123).  The bone scan revealed

hyperemia and possible cellulitis involving the left distal left leg and ankle area,

but no evidence of any osteomyelitis.  (Dkt. 55, Ex. D, p. 122).

On September 28, 2007, Daoust submitted a request for plaintiff to have a

follow-up appointment with Dr. Hutchinson, an infectious disease specialist, to

determine if plaintiff was a candidate for a skin graft.  (Dkt. 55, Ex. D, p. 103).  The

request was authorized on October 16, 2007, and an appointment with Dr.

Hutchinson was scheduled for October 31, 2007.  (Dkt. 55, Ex. D, p. 103).  On

October 31, 2007, Dr. Hutchinson examined plaintiff.  (Dkt. 55, Ex. D, p. 91).  Dr.

Hutchinson noted plaintiff's prior medical history regarding his leg wound and that

plaintiff had a 1 cm by 2 cm vertically oriented, semi-moist ulcer on the lateral

aspect of his left lower leg with no active drainage, erythema, warmth or

fluctuance.  (Dkt. 55, Ex. D, p. 91).  He also noted that plaintiff was frustrated by

his wound's recalcitrance to completely heal.  (Dkt. 55, Ex. D, p. 91). Dr.

Hutchinson noted that the 9/25/07 bone scan revealed no evidence of osteomyelitis,

but that Plaintiff had a chronic left lower extremity ulcer with the

potential for a successful split thickness skin graft.  (Dkt. 55, Ex. D, p. 91).  Dr.
Hutchinson recommended referring plaintiff to Dr. Wisneski for consideration of a
possible skin graft procedure.  (Dkt. 55, Ex. D, p. 91).  On November 20, 2007,
Mian Z. Qayyum, M.D. submitted a request for plaintiff to undergo a skin graft
surgery to be performed by Dr. Wisneski.  (Dkt. 55, Ex. D, p.67).  This request was
authorized on November 29, 2007.  (Dkt. 55, Ex. D, p. 67).

On January 17, 2008, Dr. Wisneski performed a split thickness skin graft on
Plaintiff's left ankle ulcer at Duane Waters Hospital.  (Dkt. 55, Ex. D, p. 49).  Dr.
Wisneski noted that Plaintiff tolerated the procedure well and went to recovery in a
stable condition.  (Dkt. 55, Ex. D, p. 49).  On January 25, 2008, plaintiff was
discharged from Duane Waters Hospital.  (Dkt. 55, Ex. D, p. 47).  It took roughly
two weeks for plaintiff's wound to completely heal after the skin graft surgery.
(Dkt. 55, Ex. D, pp. 45-46).  Plaintiff has not had any medical problems with his
wound or otherwise since the skin graft surgery.  (Dkt. 55, Ex. D, p. 46).

## III.    DISCUSSION

### A.    Standard of Review

Summary judgment is appropriate under Rule 56(b) "if the pleadings, the
discovery and disclosure materials on file, and any affidavits show that there is no
genuine issue as to any material fact and that the movant is entitled to judgment as
a matter of law."  Fed.R.Civ.P. 56(c).  In *Copeland v. Machulis*, 57 F.3d 476, 478-

79 (6th Cir. 1995), the court stated the standard for deciding a motion for summary

judgment:

> The moving party bears the initial burden of establishing
> an absence of evidence to support the nonmoving party's
> case.  Once the moving party has met its burden of
> production, the non-moving party cannot rest on its
> pleadings, but must present significant probative
> evidence in support of the complaint to defeat the motion
> for summary judgment.  The mere existence of a scintilla
> of evidence to support plaintiff's position will be
> insufficient; there must be evidence on which the jury
> could reasonably find for the plaintiff.

A genuine issue of material fact exists only when, assuming the truth of the non-

moving party's evidence and construing all inferences from that evidence in the

light most favorable to the non-moving party, there is sufficient evidence for a trier

of fact to find for the non-moving party.  *Ciminillo v. Streicher*, 434 F.3d 461, 464

(6th Cir. 2006).

"In deciding a motion for summary judgment, [the] court views the factual

evidence and draws all reasonable inferences in favor of the nonmoving party."

*McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  This is not to

say that some credibility determinations are beyond what is appropriate in deciding

a motion for summary judgment.  "When opposing parties tell two different stories,

one of which is blatantly contradicted by the record, so that no reasonable jury

could believe it, a court should not adopt that version of the facts for purposes of

ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 127 S.Ct. 1774, 1776 (2007).

    B.    Deliberate Indifference.

    The Supreme Court has recognized the responsibility of the courts "to scrutinize claims of cruel and unusual confinement." *Rhodes v. Chapman*, 452 U.S. 337, 352 (1981).  Included as a type of conduct that violates the Eighth Amendment is a prison official's deliberate indifference to a prisoner's serious medical needs.  *See e.g.*, *Estelle v. Gamble*, 429 U.S. 97 (1976); *Westlake v. Lucas*, 537 F.2d 857, 860 (6th Cir. 1976).  To succeed on a claim of deliberate indifference, plaintiff must satisfy two elements, an objective one and a subjective one.  He must show that he had a serious medical need and he must show that a defendant, being aware of that need, acted with deliberate indifference to it. *Wilson v. Seiter*, 501 U.S. 294, 300 (1991).

        1.    Objectively serious medical need.

    A medical need is "serious" if it has been diagnosed by a physician as requiring treatment or is so obvious that a lay person would easily recognize the necessity for a doctor's attention.  *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.), *cert. denied*, 486 U.S. 1006 (1988).  A serious ailment requires immediate attention or is potentially life-threatening: "A 'serious' medical need exists if the failure to treat a prisoner's condition could

result in further significant injury or the 'unnecessary and wanton infliction of pain.'" *McGuckin v. Smith*, 974 F.2d 1050, 1059 (9th Cir. 1992) (citation omitted), overruled on other grounds, *WMX Techs., Inc. v. Miller,* 104 F.3d 1133 (9th Cir. 1997).

A serious medical need generally falls into one of two categories (1) a medical need diagnosed by a physician as requiring treatment; or (2) a medical need that is so obvious that a lay person would easily recognize the necessity for a doctor's attention. *Monmouth County Correctional Inst. Inmates v. Lanzaro*, 834 F.2d 326, 347 (3d Cir.), *cert. denied*, 486 U.S. 1006 (1988). As to the latter category, "an inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental effect of the delay in medical treatment to succeed." *Dodson*, at *4, quoting, *Napier*, 238 F.3d at 742. As the Sixth Circuit explained in *Blackmore v. Kalamazoo Co.*, 390 F.3d 890, 898 (6th Cir. 2004):

> *Napier* applies where the plaintiff's "deliberate indifference" claim is based on the prison's failure to treat a condition adequately, or where the prisoner's affliction is seemingly minor or non-obvious. In such circumstances, medical proof is necessary to assess whether the delay caused a serious medical injury.

According to plaintiff, defendants neglected to provide him with the necessary surgery until approximately three years after his initial incarceration,

causing plaintiff to suffer numerous infections, MRSA, and ultimately Osteomyelitis. (Dkt. 61). In support of his claim, plaintiff cites to his deposition transcript. (Dkt. 61, pp. 8-11). Plaintiff claims that defendants were aware that he required surgery when he was first incarcerated, but did nothing for three years. *Id*. Plaintiff believes that the infections on his arm and hip were caused by the open wound on his leg. *Id*. According to defendants, plaintiff did not have a serious medical need at any point during his incarceration. Rather, his only issue on entrance into the MDOC was that he had an unresolved lesion on his skin near the site of his injury. Defendants argue "that there is absolutely no medical evidence that plaintiff's skin lesion ever required immediate attention or was ever potentially life-threatening." Rather, according to defendants, the medical evidence set forth in detail above demonstrates that plaintiff's condition was minor and could be managed through conservative treatment as evidenced by the treatment of plaintiff's own physicians before he was incarcerated, who viewed his skin lesion as minor and prescribed conservative treatment. (Dkt. 55, Ex D, p. 205). And, defendants argue that there is no evidence that plaintiff's medical condition caused him any serious pain. Under these circumstances, defendants assert that plaintiff has failed to meet his burden of demonstrating that he has an objectively serious medical need.

The undersigned suggests that defendants are correct. Plaintiff's claim boils down to the claim that the delay in providing the skin graft surgery caused him to suffer from unnecessary infections, caused him to contract MSRA, and caused osteomyelitis. Glaringly absent from plaintiff's submission is any "verifying medical evidence ... to establish the detrimental effect of the delay in medical treatment." Plaintiff offers no medical evidence to show that he required a skin graft any earlier than it was provided or that the timing of the skin graft resulted in any detrimental effects and none are apparent from the record. Plaintiff offers no medical to show that the open lesion on his leg caused him to contract MSRA, and no such evidence is contained in the record. And, as pointed out by defendants in their reply brief, there is no medical evidence suggesting that plaintiff ever had osteomyelitis. In fact, the record is directly to the contrary. Under the circumstances, the undersigned suggests that plaintiff has failed to meet his burden of establishing that a genuine issue of material fact exists on the question of whether he had a "serious medical need." This is a simply a case where plaintiff's deposition testimony is "blatantly contradicted by the record, so that no reasonable jury could believe it" and the undersigned suggests that the Court "should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 127 S.Ct. at 1776.

1.    Subjectively deliberately indifferent.

The second element of *Wilson* requires allegations that defendants acted with deliberate indifference.  "Deliberate indifference" has been variously defined by the federal courts that have considered prisoners' Eighth Amendment claims, but all agree that it is more than mere negligence and less than actual intent in the form of "malicious" or "sadistic" action.  *Farmer v. Brennan*, 511 U.S. 825, 861 (1994); *see also Estelle*, 429 U.S. at 105-106 (a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim under the Eighth Amendment; "medical malpractice does not become a constitutional violation merely because the victim is a prisoner"); *Sanderfer v. Nichols*, 62 F.3d 151, 154 (6th Cir. 1995) (deliberate indifference is the equivalent of "criminal recklessness, which requires a subjective showing that the defendant was aware of the risk of harm"); *Gibson v. Foltz*, 963 F.2d 851, 853 (6th Cir. 1992) ("[o]bduracy or wantonness, not inadvertence or good faith error, characterizes deliberate indifference").

As noted in *Estelle*, "[i]n order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs."  *Id.* at 106.  An allegation of mere negligence in diagnosis or treatment is not actionable under § 1983.  *Estelle v. Gamble, supra*; *Byrd v. Wilson*, 701 F.2d at 595 n. 2.  In *Whitley v. Albers*, 475 U.S. 312 (1986), the Court

held that "[i]t is obduracy and wantonness, not inadvertence or error in good faith" that violates the Eighth Amendment in "supplying medical needs." "A defendant must purposefully ignore or fail to respond to a prisoner's pain or possible medical need in order for deliberate indifference to be established." *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992). The deliberate indifference standard requires knowledge of the particular medical condition in order to establish an intent, ("a sufficiently culpable state of mind," *Wilson*, 501 U.S. at 298), to deny or to delay purposely "access to medical care" or intentionally to interfere "with the treatment once prescribed," *Estelle*, 429 U.S. at 104-05. Thus, "[k]nowledge of the asserted serious needs or of circumstances clearly indicating the existence of such needs, is essential to a finding of deliberate indifference." *Horn ex rel. Parks v. Madison County Fiscal Court*, 22 F.3d 653, 660 (6th Cir.), *cert. denied*, 513 U.S. 873 (1994).

Defendants argue that plaintiff fails to satisfy the subjective prong of the *Wilson* test because plaintiff's claim merely raises a dispute over medical judgment and fails to rise to the level of deliberate indifference. Plaintiff argues that, contrary to the defendants' contention that "this is a mere case of medical negligence, the evidence presented in the record sets forth sufficient indicia of wanton recklessness." (Dkt. 61, p. 11).

With respect to defendant Meyer, the undersigned agrees that plaintiff has filed to put forth any evidence to support the subjective element of his claim against her. The extensive medical documentation submitted by defendants shows that Meyer timely and appropriately treated plaintiff, using her medical judgment. As pointed out by defendants, plaintiff's condition generally improved during the course of treatment implemented by Meyer and, whenever plaintiff showed signs of worsening, she provided additional or different treatment, consulted with other medical professionals, and referred plaintiff for further evaluation by other medical professionals. Plaintiff may disagree now with Meyer's conservative treatment plan, but nothing in the record evidences any indifference to plaintiff's medical needs, deliberate or otherwise.

As to defendant Hutchinson, the undersigned also agrees that plaintiff has not come forth with any evidence to support the subjective element of his deliberate indifference claim. Plaintiff's only complaint against Hutchinson is that he did not secure a skin graft surgery for plaintiff. However, as defendants point out, Hutchinson secured such surgery for plaintiff. Merely because plaintiff believes that the skin graft surgery should have occurred sooner, in the absence of any evidence showing that such surgery was necessary earlier, plaintiff's claim against Hutchinson must fail. Plaintiff's claim against Hutchinson, like Meyer, is merely based on a disagreement with his medical judgment. This is insufficient to

establish the subjective element of a deliberate indifference claim. The

undersigned suggests, therefore, that plaintiff has failed to establish a genuine issue

of material fact as to the subjective prong of the deliberate indifference test in

*Wilson*.

## VI.   RECOMMENDATION

Based on the foregoing, it is **RECOMMENDED** that defendants' motion

for summary judgment be **GRANTED**.

The parties to this action may object to and seek review of this Report and

Recommendation, but are required to file any objections within 14 days of service,

as provided for in Federal Rule of Civil Procedure 72(b)(2). Failure to file specific

objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474

U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th

Cir. 1981). Filing objections that raise some issues but fail to raise others with

specificity will not preserve all the objections a party might have to this Report and

Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401

(6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370,

1373 (6th Cir. 1987). Pursuant to Local Rule 72.1(d)(2), any objections must be

served on this Magistrate Judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2,"

etc. Any objection must recite precisely the provision of this Report and

Report and Recommendation
Defendants' Motion for Summary Judgment
*Abbruzzino v. Hutchinson, et al*; No. 08-11534

Recommendation to which it pertains.  Not later than 14 days after service of an

objection, the opposing party may file a concise response proportionate to the

objections in length and complexity.  Fed.R.Civ.P. 72(b)(2), Administrative Order

09-AO-042.  The response must specifically address each issue raised in the

objections, in the same order, and labeled as "Response to Objection No. 1,"

"Response to Objection No. 2," etc.  If the Court determines that any objections are

without merit, it may rule without awaiting the response.

Date: December 18, 2009

s/Michael Hluchaniuk
Michael Hluchaniuk
United States Magistrate Judge

## CERTIFICATE OF SERVICE

I certify that on December 18, 2009, I electronically filed the foregoing
paper with the Clerk of the Court using the ECF system, which will send electronic
notification to the following: Gregory J. Rohl, Randall A. Juip, Anthony D.
Pignotti, and Brian J. Richtarcik, and I certify that I have mailed by United States
Postal Service the paper to the following non-ECF participant: Vittorio
Abbruzzino, 4901 Orchard, Dearborn, MI 48126.

s/Tammy Hallwood
Case Manager
U.S. District Court
600 Church Street
Flint, MI 48502
(810) 341-7887
tammy_hallwood@mied.uscourts.gov

Report and Recommendation
Defendants' Motion for Summary Judgment
*Abbruzzino v. Hutchinson, et al*; No. 08-11534